**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF LOUISIANA**
**(SHREVEPORT DIVISION)**

| | | |
|---|---|---|
| IN RE: | ) | Case No. 04-13259 |
| | ) | |
| HOLLYWOOD CASINO SHREVEPORT, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | JOINTLY ADMINISTERED |
| | ) | |

**OPPOSITION OF OFFICIAL COMMITTEE OF BONDHOLDERS TO BLACK DIAMOND'S MOTION TO TERMINATE THE DEBTORS' PERIOD OF EXCLUSIVITY PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE**

The Official Committee of Bondholders (the "Bondholders Committee") in the chapter 11 cases of the above-referenced debtors (the "Debtors") hereby objects to the motion to terminate plan exclusivity (the "Motion") filed by Black Diamond CLO 2000-1 Ltd. and BDCM Opportunity Fund L.P. (together "Black Diamond"), and in connection therewith respectfully represents as follows:

## PRELIMINARY STATEMENT

None of the allegations contained the Motion are new to this Court. They are a rehash of arguments first raised by Black Diamond in its motion seeking the appointment of an examiner (the "Examiner Motion"), filed shortly after Black Diamond and a small group of creditors it led filed the involuntary bankruptcy petition (the "Involuntary Petition") against Hollywood Casino Shreveport ("HCS") that resulted in the premature commencement of these cases.

As the Court will recall, by the Examiner Motion, Black Diamond argued that an examiner was necessary because: (a) the Debtors had breached their fiduciary duties to creditors by allegedly (i) refusing to consider and failing to move forward with an allegedly economically superior Black Diamond proposal to bid the equity of HCS (Examiner Motion, pp. 4-5, par. 7),

550250.1
LA1:#6300433

and (ii) abdicating their decision-making powers to AIG and Trust Company of the West ("TCW") (Examiner Motion, pp. 3-4, pars. 5-6; p. 9, par. 17); and (b) the selection of Eldorado Resorts, LLC ("Eldorado") as the successful purchaser of HCS was the result of a flawed process that did not maximize value to creditors and therefore was improper (Examiner Motion, pp. 1-2).

During the October 29, 2004, hearing on the Examiner Motion, Robert Rosenbloom, a partner in Black Diamond, testified as to what Black Diamond hoped to accomplish by the appointment of an examiner:

> Q. (By Mr. Jonas) Mr. Rosenbloom, and on September 24th did Black Diamond file a motion for the appointment of an examiner?
>
> A. Yes, we did.
>
> Q. And why did you take that action?
>
> A. Well, it, it kind of went hand in hand with wanting to get an impartial third party involved. We thought that, that bringing in an examiner to take a look at the sale process and everything that went on, we had an impartial party that could say, yes, they did a great job, an impartial party that could say, no, we think that, that things should be done differently.
>
> THE COURT: If I appoint an examiner and the examiner told you that what Mr. Hull said about the risk to the business of long-term bankruptcy and losing the market and the cost and the employees, if the examiner agreed with that, and if I were to choose the Eldorado package after that, you might not be happy but at least you'd understand that that was the process.
>
> THE WITNESS: I would feel a lot better about it, yes.
>
> THE COURT: There would be somebody else besides the other two bondholders and Mr. Hull and Mr. Clemente involved in this process.
>
> THE WITNESS: That's correct.
>
> THE COURT: Okay.
>
> THE WITNESS: And that is, that is, that's our reason for having, just, we just want an impartial third party eye because we're not confident that right now that this is an impartial, that we're dealing with an impartial, other impartial parties.

Transcript Of Proceedings, October 29, 2004 Hearing on Examiner Motion, pp. 195-196.[1]

On October 30, 2004, as part of the order for relief on the Involuntary Petition (the "Order for Relief"), the Court ordered the appointment of an examiner (the "Examiner Order") for the limited purpose of: (i) reviewing the pre-petition bid process to determine whether it was performed in a proper and competent fashion; whether the scope of the solicitations for bids was sufficient and performed in a timely fashion; (ii) reviewing the bids submitted during the process and review how those bids were rated, ranked and selected for further interaction; (iii) reviewing the process by which the Eldorado bid was selected as the successful bid; (iv) determining values of the bids submitted and selected for further interaction; and (v) recommending to the Court whether further bid processes should be engaged or should the Eldorado bid be pursued as a major component of the Debtors' plan of reorganization. The Examiner Order was superceded by an order dated November 19, 2004 (the "Mediator Order"), consensually agreed upon by all interested constituents, that appointed David S. Rubin (the "Mediator") as a mediator with the same purpose and scope of direction given to the examiner in the Examiner Order.

At a hearing that took place on December 6, 2004, to address various motions and applications before the Court, and in response to an indication by Black Diamond's counsel that Black Diamond intended to press discovery demands against the Debtors and the Bondholders Committee even prior to the completion of the Mediator's report, the Court, in an effort to discourage what could be expensive and potentially unnecessary discovery, clearly stated as follows:

> We…have in Mr. Rubin, a mediator, and what Mr. Rubin will hopefully be able to do is to evaluate what has been done in a timely fashion and make a recommendation to this Court to the parties on what should be done. And his recommendation may be to accept what has already been done. Your client told

[1] A copy of this transcript has not yet been lodged on the Docket of the Court. Counsel to the Bondholders Committee will attempt to have same lodged prior to the hearing on the Motion.

> me that's what he wanted, was somebody to look at it and somebody to tell him whether or not that was what should be done. And he in essence told me that if that was the determination of this Court that he would abide by it. So you've got to remember one thing: I remember.

Transcript Of Proceedings, December 6, 2004, p. 109 [Doc. No. 272].

On February 14, 2005, the Mediator filed his report (the "Report" or the "Mediator Report") with the Court. The Mediator reached conclusions in the Report favorable to the pre-petition bid process and as to each of the items designated for review in the Mediator Order. Those conclusions are as follows: (i) the pre-petition bid process was conducted in a proper and competent fashion under the circumstances; (ii) the scope of solicitations for bids was sufficient and adequate; (iii) notwithstanding certain time pressures, the process was not untimely; (iv) the bids submitted during the process were appropriately ranked based on both quantitative and qualitative facts existing at the time the bids were made and evaluated; and (v) under the circumstances that prevailed at the time, the selection of the Eldorado bid was appropriate and, as of August 27, 2004, the Eldorado bid offered the highest economic return to creditors. Report, pp. 8-9. The Mediator also stated that he did not believe that a new formal auction would be in the best interests of the estates and their creditors. Report, p. 12.

Although he was not tasked to do so, the Mediator also offered opinions with respect to a last-minute, amended further purchase offer made by Black Diamond on the eve of the hearings on the Involuntary Petition and the Examiner Motion (the "October 25 Offer") and yet another Black Diamond "offer" submitted three days after the conclusion of a two-day mediation among the major constituencies in the cases (the "January 28 Offer"). With respect to the October 25 Offer, the Mediator stated his belief that while the October 25 Offer might be higher on a "purely quantitative economic basis," the economic differences between the Eldorado offer and the October 25 Offer, based upon the circumstances then existing, were not "demonstratively

material in terms of the scope of the transaction." Report, p. 10.[2] Furthermore, there were non-economic and qualitative differences between the Eldorado transaction and the October 25 Offer that formed an appropriate basis for the Debtors to continue to move forward with the Eldorado transaction. Report, pp. 9-10.

The Mediator made clear in his Report that he did not fully analyze the January 28 Offer and had not obtained the input of an independent financial advisor. Report p. 11. However, he indicated his belief that the January 28 Offer was a material event that required

(i) disclosure in the disclosure statement accompanying the Debtors' plan (Report, p. 98), and

(ii) due consideration by the Debtors' board and the Bondholders Committee (Report, pp. 92 and 95) (emphasis added). Further, the Mediator noted that if the Court wished to expose the January 28 Offer to a confirmation test, the only practicable option available would be to consider

---

[2] Indeed, during the October 29, 2004, hearing on the Examiner Motion, Mr. Rosenbloom of Black Diamond testified, in response to questions posed by Mr. Moore on behalf of the ad hoc committee of noteholders, that Mr. Rosenbloom, himself, would not accept Black Diamond's October 25 Offer because it suffered from insufficient liquidity to align the interests of the buyer, Black Diamond, with the interests of the noteholders:

> Q. And I think you testified that one of your biggest problems with the Eldorado bid was that there was insufficient liquidity in the company, insufficient cash, to align the interests of the buyer to the interests of the noteholders.
>
> A. That's correct.
>
> Q. Is it your testimony that [the October 25 Black Diamond] bid that would have had a net cash influx of an additional $500,000 would have rendered that sufficient liquidity and would have brought, then, you as the buyer in conformity with the interest of the noteholders?
>
> A. Absolutely not. I mean, our interest would have been to do as well as we could in the company but I don't think, I don't pretend that this bid is structured in a way that we think that this company should look when it comes out of bankruptcy.
>
> Q. So this is a bid, frankly, you wouldn't accept.
>
> A. <u>This [the October 25 Black Diamond offer] is a bid I would not accept</u>.

Transcript Of Proceedings, October 29, 2004 Hearing on Examiner Motion, p. 248.

terminating plan exclusivity.[3] Report, p. 98. However, the Mediator refused to recommend that the Court terminate exclusivity (Report, pp. 97-98) and maintained that, notwithstanding the January 28 Offer, he would not reopen the bidding process. Report, p. 92. The Mediator recognized that time is the enemy of the estates and the creditors in these cases.

Black Diamond received precisely that for which it asked in the Examiner Motion: an "impartial third party eye" to review the pre-petition sale process and the selection of Eldorado as buyer and report on whether or not the process and selection had been properly undertaken. Not pleased with the Mediator's validation of the pre-petition bid and sale process and the selection of Eldorado, Black Diamond now revisits in the Motion the very same arguments that it pled in the Examiner Motion in an effort to terminate plan exclusivity, propose a competing plan, and, in effect, reopen the bidding process. The Mediator already has demonstrated that Black Diamond's contentions regarding the Debtors and bondholders' conduct are without merit. Those contentions are no more meritorious now and, based upon the findings in the Report and the record in these cases, they are without credibility.

Black Diamond's previous conduct in these cases already has imposed on creditors significant delay in recovery and has cost the estates and their creditors millions of dollars in legal fees and expenses. Black Diamond's present behavior only further exacerbates the problem. The prospect of the competing plan process that Black Diamond now proposes, and the resulting inevitable delay in achieving a timely exit from bankruptcy, would expose the estates and their creditors to the risk of potentially millions of additional dollars in diminished value through mounting professional fees and direct and ongoing operational damage to the

---

[3] Obviously, Black Diamond has taken the Mediators' statement as its cue to file the Motion.

Debtors' business operations. Delay also increases the risk to the estates of losing Eldorado as purchaser.[4]

Distilled to its essence, the sole basis for the Motion is Black Diamond's unsupported proposition that the January 28 Offer is a higher and better bid than that of Eldorado. However, this assertion, in and of itself, is insufficient to terminate exclusivity. As is discussed below, and as will be developed in testimony that will be elicited in the Court, the January 28 Offer, the latest offer in a line of eleventh hour offers submitted by Black Diamond to the Debtors, has material problems. The Bondholders Committee has considered the January 28 Offer and does not believe that it is either materially higher or better. Moreover, even if the bid is found to be economically higher on a quantitative basis, the Bondholders Committee does not believe that it is a better bid or a superior bid for which necessary licensing approvals can be obtained on a timely basis, if at all.

A significant majority in amount of the Debtors' Noteholders favors the Eldorado Agreement and is of the view that, if even if the January 28 Offer were to be incorporated into a competing plan, that plan would not be acceptable or confirmable. The Black Diamond-sponsored plan of reorganization is not confirmable without the support of a majority in amount of the debt represented by the Bondholder Committee. Support for Black Diamond, as the owner-operator of the Debtor post-bankruptcy, simply does not exist and is not remotely close to existing. Consequently, the proposed termination of exclusivity ultimately would prove to be a risky, futile, costly and self-defeating detour.

---

[4] Under the present terms of Eldorado's agreement to acquire HCS (the "Eldorado Agreement"), unless the transaction closes by March 31, 2005, it is subject to being terminated by either party. The Debtors and Eldorado recently have amended the Eldorado Agreement to extend the closing deadline to June 30, 2005, and the Debtors have filed a motion with the Court to approve this extension.

## ARGUMENT

**1. Black Diamond Has Failed To Establish Cause That Would Warrant The Termination Of Exclusivity.**

The Bankruptcy Code provides debtors with a limited exclusive period in which to propose a plan of reorganization and obtain its acceptance, without exposure to the potential delays, costs and procedural vexations of turning a case into the free-for-all quagmire of competing plans. "Exclusivity" is one of the primary protections granted by Congress to debtors in chapter 11 cases; exclusivity gives the debtor some leverage to bargain with creditors to protect the unsecured creditors and equity interests. In re AMKO Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio,1996) citing 5 Collier on Bankruptcy (15th ed.) ¶ 1121.04 at p. 1121-16. During the first 120 days of a Chapter 11 case in which the debtor remains in possession, only the debtor may file a plan of reorganization. If the debtor files a plan of reorganization within that 120 day period, then the debtor has up to 180 days after the date of the order of relief to obtain acceptance of that plan before any other party in interest may file a competing plan. If the debtor files a plan but fails to obtain creditor acceptance within 180 days following the date of the order for relief, the exclusivity period automatically terminates. Any creditor or party in interest may then file a plan of reorganization. See 11 U.S.C. § 1121(b) and (c); In re Washington-St. Tammany Electric Co-op., 97 B.R. 852, 853 (E.D. La.1989).

As the Court is well aware, the Debtors first filed their plan of reorganization and disclosure statement in support thereof on October 28, 2004. More recently, the Debtors, together with the Bondholders Committee and a non-Debtor affiliate as co-proponents, filed an amended plan of reorganization (the "Plan"). The Debtors' exclusive right to solicit acceptance of the Plan presently is scheduled to expire on April 28, 2005. The hearing on the disclosure statement in support of the Plan is set for April 11, 2005. Because it would be impossible at this stage to reach a confirmation hearing on the Plan by April 28, the Debtors recently filed a motion to extend exclusivity through May 31, 2005, little more than 33 days past the date the original period otherwise would terminate.

In In re Express One International., Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996), citing In re Pine Run Trust, Inc., 67 B.R. 432, 435 (Bankr. E.D. Pa.1986), Express One International ("Express") filed a voluntary petition pursuant to chapter 11 of the Bankruptcy Code. The Court had extended Express' exclusivity period twice and Express requested a third extension. Kitty Hawk Charters, Inc. ("Kitty Hawk"), a prospective bidder for the Debtor's assets, moved to terminate Express' exclusivity period so that Kitty Hawk could file a plan of reorganization. Kitty Hawk argued exclusivity should be terminated in order to file its own superior plan. The court granted Express's motion for an extension of exclusivity and denied Kitty Hawk's motion to terminate exclusivity, noting the issue was "not whether some other plan may exist which provides greater recovery; the issue [was] whether the debtor [had] been diligent in his attempts to reorganize." Id. at 101. The court believed that Express had diligently attempted to reorganize, had timely filed a plan and disclosure statement, and had negotiated with the creditors.

The facts in these cases are remarkably similar to those present in Express and are even more compellingly favorable to maintaining the Debtors' continued plan exclusivity. As in Express, these are not cases in which creditors are being held hostage by Debtors or in which the Court has been asked to extend the exclusivity period for an indefinite period of time. Here, the Debtors filed their original plan on October 28, 2004, two days prior to the entry of the Order For Relief. The plan, both as then filed and as more recently amended, was the product of extensive arms-length negotiation between the Debtors and their largest creditor constituency, the bondholders, and attempts to address the negotiated economic expectations of the most significant non-bondholder unsecured creditors and the official committee appointed to represent their interests. There is incontrovertible evidence that they have attempted diligently to reorganize while working hand-in-hand with their creditor constituencies.

As in Express, the sole detractor to the Debtors' plan process is a party that strongly desires to acquire the Debtors' business and assets, claiming that its latest proposed offer is superior to transaction with Eldorado proposed under the Plan. However, the allegation that

Black Diamond has a "better" offer simply is not sufficient cause to justify termination of the Debtor's exclusivity period and, as evidenced by the paucity of authority cited in the Motion, has no support in prevailing case authority. Moreover, the allegation itself is not true as a matter of fact.

In considering whether to terminate a debtor's plan exclusivity, courts typically look to factors that include: (i) whether the debtor is using exclusivity to force creditors to accept an unsatisfactory plan for only its advantage; (ii) whether the debtor is delaying the filing of a plan or attempting to prolong reorganization for certain impermissible purposes; (iii) whether there has been gross mismanagement of the debtor's operations; (iv) whether acrimonious relationships exist between the debtor's principals; (v) whether there is feuding between the principal parties; (vi) whether potential harm or prejudice to creditors would occur by continued exclusivity; (vii) whether the debtor is attempting to hold creditors hostage to the bankruptcy proceeding; and (viii) whether there is a stalemate in plan negotiations among the key constituents in the case. <u>The Bankruptcy Code, Section 1121: Exclusivity Reloaded</u>, 11 Am. Bankr. Inst. L.Rev. 451 (Winter, 2003). None of these factors exist here.

In this instance, the Court should also focus on the nature of the party now seeking to up end the plan confirmation process. Notwithstanding any statements by Black Diamond to the contrary, Black Diamond's desire to unwind the Eldorado Agreement is not motivated by its status as a bondholder or by a desire to maximize the value of its investment in the Notes through a transaction that brings the greatest value to all bondholders. Rather, Black Diamond seeks to unwind the Eldorado Agreement because Black Diamond, a failed bidder for HCS, still wants to take a controlling interest in reorganized HCS. Although, prior to the pre-petition bid process, Black Diamond held a relatively small position in the Notes, it did not begin to acquire the vast majority of its present holdings of the Notes until <u>after</u> the Debtors rejected Black Diamond's bid for HCS. If Black Diamond, as a bondholder, really is as troubled by the transaction contemplated by the Eldorado Agreement as it claims to be, it is unlikely that Black Diamond would have put at risk millions of additional dollars after the Debtors' announced their selection

of Eldorado as the successful bidder. Indeed, as Mr. Rosenbloom admitted in testimony, Black Diamond acquired its additional position in the Notes in an attempt to block any effort by the Debtors to confirm a plan of reorganization that facilitates a transaction with Eldorado.[5] The Bondholders Committee firmly believes that Black Diamond's accumulation of its position for this purpose was not in good faith. Furthermore, it does not believe that the efforts of this disgruntled and frustrated bidder to sabotage the Plan process irrespective of the concomitant damage that it is doing to these estates is supportable under applicable law or should be countenanced by the Court.

**2. <u>The January 28 Offer is Not Higher and Better than the Eldorado Offer</u>.**

Notwithstanding Black Diamond's assertion to the contrary, the Bondholder Committee has given careful consideration to the January 28 Offer. Numerous factors have lead the Bondholder Committee to conclude that the January 28 Offer is not a higher and better offer than the consideration that the estates' creditors will receive under the Eldorado Agreement. Although the January 28 Offer very well may be in the best interests of Black Diamond as an acquirer, it is not in the best interests of the estate or its creditors.

Among the factors that the Bondholders Committee has considered in evaluating the January 28, 2004 Offer (as well as the October 25 Offer) and in comparing it to the Eldorado Agreement are the following: (i) the certainty of a closing and the avoidance of further risk and deterioration to the casino and hotel property; (ii) the substantial cost of delay (including delay on account of disruption to the plan confirmation process, licensing risks for Black Diamond and for Paul Alanis, and the need to negotiate and document any further transaction); (iii) the substantial additional value that Eldorado offers; (iv) the Bondholders Committee's inability to assess the value of any Black Diamond bid that is unaccompanied by a business plan and

---

[5] See, Transcript Of Proceedings, October 29, 2004 Hearing on Examiner Motion, pp. 236-237.

detailed operating projections; and (v) the illusory value of the post-effective date term loan aspect of the January 28 Offer.

**A. Certainty of Closing and Avoidance of Further Risk/Deterioration.**

First and foremost, Eldorado, the successful bidder in a lengthy pre-petition sale process endorsed by the Mediator, and in which Black Diamond had ample opportunity to submit the highest and best bid for the equity of HCS, but did not, is signed up to a purchase agreement with the Debtors that has been fully documented, and that awaits the satisfaction of only two conditions precedent to reach a closing: (i) confirmation of the Plan; and (ii) approval of suitability applications filed by Eldorado with the Louisiana Gaming Control Board (the "LGCB"). The Bondholders Committee is highly confident that, even over the objection of and negative vote of Black Diamond, the Plan is confirmable within a very short period of time. Moreover, as is set forth below, and as may be further elicited in testimony that will be given at the hearing on the Motion, the Bondholders Committee understands that the suitability investigation by the Louisiana State Police is quite far along. The Bondholders Committee also is confident, given the history and status of Eldorado and its management team in the gaming community, that Eldorado and its management team will be found suitable by the LGCB within a relatively short period of time. As further discussed in section 2.B.(iv) below, Eldorado has been an upstanding member of the Nevada gaming community for more than 30 years and is already at a very advanced stage in its suitability applications with and investigations by Louisiana gaming regulators.

In contrast, and as further discussed below, the delay, cost and uncertainty inherent in the January 28 Offer, or any further Black Diamond offer, are substantial. Eldorado is the proverbial "bird in the hand." If plan exclusivity is terminated, and the plan process is opened up to what, in essence, would be further bidding (by any Johnny-come-lately) for HCS, there is considerable

risk that the Debtors will lose Eldorado as a purchaser. The Eldorado Agreement was executed some five months ago (memorializing an agreement in principle reached two months before that) and contemplated a pre-negotiated plan process that would minimize the Debtors' time in, and the attendant business dislocation and expense that would result from, a bankruptcy. Obviously, not all has gone as planned, largely because of Black Diamond's unfounded allegations of impropriety. If the delay and disruption Black Diamond now seeks to engender through a competing plan process becomes too great,[6] and if Eldorado abandons its commitment to consummate the transaction with the Debtors, the Debtors will lose all leverage in any further restructuring and sale negotiations. That circumstance will inure only to the benefit of Black Diamond, as the sole remaining potential purchaser. This result would be disastrous for the Debtors, their estates and their creditors.

**B. <u>Substantial Cost of Delay</u>.**

These bankruptcy cases already have harmed the Debtors both economically and operationally. The Debtors have paid millions of dollars in professional fees in these cases (including approximately $750,000 in payments to the professionals of Black Diamond, on an interim basis, and others in connection with disputes over the Involuntary Petition and the Examiner Motion). The Bondholders Committee is informed and believes that the Debtors also have lost key employees and customers because of the uncertainties created by the bankruptcies. Free cash flow from operations is substantially less today than it was when Eldorado and the Debtors first entered into their agreement in principal in August 2004, as later memorialized in the Eldorado Agreement. Each passing week that these cases languish in bankruptcy leads to further fees and further operational dislocation (*i.e.*, lost employees and customers as a

---

[6] The Bondholders Committee is concerned that even the termination of plan exclusivity could be viewed by Eldorado as a basis to terminate the transaction.

consequence of confusion and concern regarding the stability of operations, employment, jackpot payoffs, the inability to launch and sustain new, coherent marketing plans, etc.).

The Bondholders Committee is extremely concerned about the continuing toll on the Debtors and their estates and creditors that will inevitably flow from the further delay that termination of plan exclusivity or the acceptance of the January 28 Offer (or any further offer from Black Diamond) would impose. At a minimum, further delay will cost the estates and their creditors additional millions of dollars in value in mounting professional fees and operational deterioration.

**(i)** **Delay To Plan Confirmation Process**. If exclusivity is terminated and Black Diamond is permitted to file its own competing plan and disclosure statement and solicit confirmation on a parallel track with confirmation of the Plan (a result that the Bondholders Committee would vigorously oppose even if the Debtors' plan filing exclusivity were terminated), the present dates set or planned for hearings on the Debtors' disclosure statement and confirmation of the Plan inevitably will be delayed in order to accommodate the filing of a Black Diamond sponsored plan and disclosure statement. Time slippage could be as much as one to two months from the dates now intended.[7]

**(ii)** **Licensing Risks for Black Diamond**. Licensing Risks for Black Diamond. There would seem little doubt that the necessary in-depth investigation and approval process undertaken by the Louisiana State Police and the LGCB to determine Black Diamond's suitability to own a gaming operation would take months longer to complete than the process already progressing to conclusion for Eldorado. First, to the

[7] Presently, the Debtors' disclosure statement in support of the Plan is set to be heard by the Court on April 11. If the disclosure statement is approved, the Bondholders Committee believes that a confirmation hearing on the Plan would follow as soon as middle or late May.

best knowledge of the Bondholders Committee, Black Diamond has not yet submitted suitability applications to the Louisiana State Police, and no process has been commenced by that body to investigate Black Diamond's suitability. The Bondholders Committee does not believe that Black Diamond has ever been licensed to own or operate a gaming establishment in any jurisdiction. Second, Black Diamond is a privately owned hedge fund that is a manager of various partnerships and other entities that manage and invest the money of others. Black Diamond is nothing like the type of gaming purchaser that state regulators are accustomed to investigating and considering for suitability. By virtue of its nature as a unique applicant, there would be significant complexities in any Black Diamond suitability proceedings undertaken by gaming regulators. Among those complexities, gaming regulators would need to determine which of Black Diamond's employees, principals, partnerships and funds, or other entities that Black Diamond owns or controls, would need to be exposed to suitability investigations. Gaming regulators also would need to consider whether clients who have placed sizeable investments with Black Diamond would need to be exposed to a suitability investigation.[8] Based upon the foregoing, any suitability investigation and determination process in connection with Black Diamond undoubtedly would take a very long time. And, importantly, there are no assurances that Black Diamond ever would be found suitable.

**(iii)** **<u>Licensing Risks for Paul Alanis</u>**. The Bondholders Committee also has concerns regarding Paul Alanis' ability to be found to be a suitable owner/operator of a reorganized HCS on a timely basis. The Bondholders Committee is informed and believes that Mr. Alanis was forced, in April 2002, to resign as Chief Executive Officer

---

[8] LSA-RS 27:28H(1) states that 'any person who has or controls directly or indirectly five percent or more ownership, income or profit or economic interest in an entity which has or applies for a license . . . shall meet all suitability requirements" of the state gaming laws and regulations.

of Pinnacle Entertainment, Inc. ("Pinnacle") and, thereafter, agreed to relinquish or allow to lapse personal gaming licenses he held in the states of Indiana and Louisiana as a consequence of a scandal involving prostitutes and inappropriate behavior at the Pinnacle-owned Bellterra casino in Indiana.[9] Mr. Alanis has, in sworn statements, acknowledged that, based in part on the scandal in Indiana and his subsequent resignation from Pinnacle, his reputation in the State of Louisiana and amongst its regulators, has been severely and possibly irreparably damaged.[10] These issues will certainly be closely scrutinized by the Louisiana regulators. As is the case with Black Diamond, to the best knowledge of the Bondholders Committee, Mr. Alanis and his "team" have not yet submitted suitability applications to the Louisiana State Police and no process has been commenced by that body to investigate their suitability.

**(iv) Likely Licensing of Eldorado**. Unlike Black Diamond or Paul Alanis, Eldorado is a long-established, well-respected, licensed gaming operator in the State of Nevada with a highly regarded ownership and management team. The Carano family, which owns Eldorado, has been active in the Nevada gaming market for decades. Donald Carano, the founder and principal owner of Eldorado, is a member of the Board of the American Gaming Association (the "AGA") and an inductee into the AGA's Gaming Hall of Fame. The Bondholder Committee is informed and believes that the Louisiana State Police is well down the road in the suitability investigation of Eldorado, already having (i) traveled to Reno to investigate Eldorado's gaming operations, and (ii)

[9] The facts relating to the license relinquishments and suitability in general is the subject of discovery that has been promulgated by the Bondholders Committee, the results of which will be presented to the Court at the April 4 hearing on Black Diamond's Motion.

[10] LSA-RS 27:28A 1) require that an applicant be a person whose "prior activities, criminal record, if any, reputation and associations do not pose a threat to the public interest of this State or the effective regulation and control of gaming, or create or enhance the dangers of unsuitable, unfair or illegal practices, methods and activities in the conduct of gaming . . . . "

conducted what the Bondholders Committee understands were several face-to-face meetings with Eldorado's senior management and ownership. Based upon the foregoing, the Bondholders Committee is highly confident that the suitability applications of Eldorado and its management team members will occur in a reasonably timely fashion following confirmation of the Plan.

**(v) Delay Arising From Need to Negotiate and Prepare New Documentation**. Although it has been suggested that Black Diamond simply can step into the shoes of Eldorado with respect to each and every agreement and document now in place in connection with the with the Eldorado Agreement, and thereby cause no delay to a closing as a result of a need for additional documentation or further negotiations, the Bondholders' Committee believes that such a view is naïve and disregards reality. Black Diamond, a hedgefund with no gaming industry experience, is not Eldorado, a long time, well-respected gaming company. It is not a long-established, well-respected, licensed gaming operator as is Eldorado. Rather, it is a small, privately held hedge fund with no experience as an owner or operator of a casino. The Bondholders Committee expects that the existing Eldorado documentation would require material renegotiation and modification to fit into a Black Diamond acquisition scheme which, of course, would lead to weeks, if not months, of additional delay and expense to the Debtors.

**C. The Value that Eldorado Brings to Reorganized HCS is Substantial**. Black Diamond complains that Eldorado will contribute to reorganized HCS only $5 million in up front capital under the Eldorado Agreement. However, Black Diamond neglects to consider other material contributions that Eldorado will be making to reorganized HCS that Black Diamond and Paul Alanis are not able to offer. Eldorado will contribute far more than just $5 million to reorganized HCS. It also will be contributing its strong brand, a meaningful customer base, a

dedicated, broad and deep management team and corporate infrastructure, experience in joint venture projects and certain proprietary technology. The Bondholders Committee believes that these contributions are significant and in some respects non-quantifiable value that make Eldorado much more capable and likely than the Black Diamond/Paul Alanis team of effecting a turn around of reorganized HCS.

**(i)** **Brand.** Eldorado brings with it a strong, well recognized, thirty year old brand, with a loyal customer base that the Bondholders Committee believes will be appealing to the demographic that HCS seeks to attract. The Bondholders Committee understands that the Black Diamond/Paul Alanis team intend to rename and rebrand the Debtors' casino and hotel as a "Silver Slipper" property. Silver Slipper is a name and brand that has been long dormant, has little or no recognition and is inconsistent with the demographics of the Shreveport gaming market, in contrast to Eldorado, a western brand consistent with the predominant gaming theming in the Bossier-Shreveport market.

**(ii)** **Customer Base**. The Bondholders Committee is informed and believes that Eldorado has a considerable database of customers, including significant contacts and relationships in the critical Dallas feeder market. These contacts and relationships derive, at least in part, from those of Glenn Carano, Eldorado's Director of Marketing and a former quarterback for the National Football League's Dallas Cowboys. Glenn Carano and, hence, Eldorado have strong ties to both the Dallas Cowboy organization and professional athletes and media in the Dallas community. Conversely, the Bondholders Committee is informed and believes that the Black Diamond/Paul Alanis team does not have an active data base of customers to contribute to a reorganized HCS.

**(iii) Management Team.** Eldorado has proposed a very deep management team of eight-to-ten persons to take over day-to-day management of reorganized HCS following the effective date of the Plan. Members of the Bondholders Committee have met with and interviewed many of these management team members and are very impressed by their industry knowledge, continuity and length of tenure as a team, management skills, and level of commitment to Eldorado and the transactions contemplated under the Eldorado Agreement and Plan. A broad team of Eldorado managers and executives already has spent extensive time and resources in building a highly detailed turn around strategy and business plan for reorganized HCS.

By contrast, Alanis has presented a very thin management team of some four-to-five people. Certain members of the Bondholders Committee have met with members of the Alanis team and, based upon those meetings, have serious concerns about the depth and skill sets and qualifications of that team and, in particular, its most critical member, the proposed general manager for a reorganized HCS. The Bondholders Committee is informed and believes that, unlike the Eldorado team, which has worked together for many years, the Alanis team members have had limited experience with one another as a team. Moreover, it is troubling to the Bondholders Committee that the Paul Alanis team has been unable to provide the Debtors with a meaningful business plan or projections for reorganized HCS. Instead, Black Diamond and Alanis have instructed the Debtors and the Bondholders Committee that they simply should use and rely upon the business plan and detailed projections created by Eldorado's management team (plans and projections that Alanis did not generate and presumably has no independent basis to adopt as applicable to a Black Diamond transaction). This response is wholly inadequate and does

not inspire confidence in Alanis' management team's ability to perform even the most basic and necessary of tasks that one would expect from a management team.

The Bondholders Committee also has concerns that the Alanis management team will not be able to give sufficient attention to the turnaround of a reorganized HCS. The Bondholders Committee understands that Mr. Alanis is in the process of trying to start up another riverboat gaming operation at the site of a failed gaming operation in Hancock County, Mississippi that has been defunct for some nine years. It is unclear to the Bondholders Committee how Mr. Alanis intends to allocate the resources necessary to manage both a turnaround operation and a start-up operation at the same time. It strikes the Bondholders Committee that these dual track operations would represent a massive undertaking for this management team and one that could result in conflicts of interest and inadequate attention being provided to a reorganized HCS.

**(iv) Proprietary Technology.** Eldorado owns and has experience developing proprietary technology for hotel and casino management and operations. For example, Eldorado developed (and subsequently sold to Alliance Gaming Corp., a publicly traded gaming company) a sophisticated table player scoring system called MindPlay. Eldorado also has developed its own sophisticated casino management systems, modifications to slot systems and interfaces with other software programs – all valuable assets which will be made available by Eldorado to reorganized HCS.

**(v) Corporate Infrastructure.** In addition to the foregoing, Eldorado has a corporate infrastructure to supplement and support the corporate offices at reorganized HCS. Eldorado has over 2,000 employees including a sizeable accounting, control and legal staff who are expert with Eldorado's business processes and the gaming regulatory environment. Also, Eldorado is experienced in managing joint venture projects such as

the Silver Legacy, a 1,700 room hotel and casino in Reno, Nevada. The Silver Legacy is jointly owned by Eldorado and Circus Circus and opened in 1995.

### D. Virtual Impossibility to Assess Accurately the Value of any Bid by Black Diamond/Paul Alanis Absent a Business Plan and Detailed Projections

In June, 2004, during the pre-petition bidding process for HCS, but before Mr. Alanis withdrew his individual and higher stand alone bid to team with Black Diamond, Mr. Alanis provided the Debtors with a business plan and set of projections (the "Alanis Business Plan") for a reorganized HCS under his management team. The Alanis Business Plan represented the highest and most aggressive set of projections that the Debtors received from any of their bidders. Both the Debtors and the Ad Hoc Committee believed that the Alanis Business Plan was overly optimistic. In August, 2004, the Debtors revised its own projections downward and the remaining other bidders, including Eldorado, did the same. Alanis did not. The Alanis Business Plan, now almost ten months old, is stale and cannot reasonably be relied upon.

In order to analyze the value of the offers that have been made by Black Diamond, the Debtors and the Bondholders Committee repeatedly have asked the Black Diamond/Alanis team to provide a new, updated business plan and set of projections. They have refused to do so and, as discussed briefly above, instead have instructed the Debtors and the Bondholders to analyze the value of their bids, including the January 28 Offer, by using and relying upon the projections and business plan submitted by Eldorado in support of the Eldorado Agreement. This response is neither reasonable nor remotely helpful to the Debtors and the Bondholders Committee in their evaluation of the January 28 Offer. The Debtors and the Bondholders Committee cannot reasonably rely upon Eldorado's business plan and projections in valuing the January 28 Offer. To do so would be to suggest that Alanis' management team has the exact same plans for operation of a reorganized HCS that Eldorado has, and that Alanis and Black Diamond will be

able to contribute to a reorganized HCS precisely that which Eldorado will contribute. As set forth above, that presumption simply is not valid. Eldorado and Alanis offer entirely different management teams with entirely different skill sets. They will contribute entirely different brands. Eldorado has a highly valuable proprietary information technology system and a preexisting customer base and deep connections with feeder markets that the Black Diamond/Alanis management team does not have. As a consequence, Eldorado's advertising and marketing campaigns likely will be very different from that which would be pursued by the Alanis management team. Silver Slipper is not Eldorado. It cannot and will not operate a casino in the same fashion as Eldorado. It certainly cannot expect the Debtors or the Bondholders Committee to rely upon business plans and projections of Eldorado in valuing the January 28 Offer, especially when neither Black Diamond nor the Alanis management team has seen those business plans and projections. In order to assess the highest and best bid during the pre-petition sale process, the Ad Hoc Committee spent a great deal of time evaluating differences between each bidder's management team, brand and corporate resources (as opposed to simply the transaction structure as Black Diamond suggests).

### E. <u>The Illusory Value of the Post-Effective Date Term Loan Aspect of the January 28 Offer</u>

The January 28 Offer indicates a willingness by Black Diamond to provide a $10 million secured revolving credit facility to provide reorganized HCS with additional liquidity and invites other bondholders to participate. The Bondholders Committee does not attribute any value to this element of the January 28 Offer. In essence, the Black Diamond-controlled reorganized HCS would be paying interest on the bondholders' $140 million in new secured notes through a priming loan that would diminish the value of those new secured notes by any amounts drawn.

Further, to the extent bondholders participate in the priming loan they essentially would be using their own money to pay the interest to which they are entitled under the new secured notes.

### 3. **<u>The Bondholders Committee's View of Black Diamond is Based Upon Objective Observation and Evaluation of Black Diamond's Conduct, Not On Personal Agendas</u>**.

Black Diamond suggests that certain members of the Bondholders Committee will not accept the January 28 Offer because those members bear ill-will or a grudge against Black Diamond. This simply is not the case. Personal agendas have not driven, and do not drive, the decision-making process of the Bondholders Committee. Each member of the Bondholders Committee is a financial institution that manages billions of dollars in assets. For instance, AIG manages and advises in excess of $500 billion in assets, TCW manages and advises in excess of $110 billion in assets, and Eaton Vance manages and advises in excess of $98 billion in assets. Prior to committing assets that they manage to an investment, the investment committees of these large institutional money management firms, and other similarly situated financial institutions, evaluate numerous factors in connection with the investment to ensure that it is a sound one. The credibility and integrity of a company's management team and equity sponsor are key criteria in respect of investments made by these firms, especially in light of the additional levels of scrutiny to which officers and directors of public reporting companies have been subjected in recent years by the federal government. Assessment of the integrity and competence of a company's management and equity sponsor are crucial aspects to business judgment for investment professionals.

As discussed above, a majority of the Bondholders Committee has significant concerns regarding the competence of the proposed Alanis management team as identified by Black Diamond. As stated above, the Bondholders Committee believes that the Alanis management

team lacks the depth, breadth and resources required to effect successfully the turnaround of reorganized HCS. In addition, a majority of the members of the Bondholders' Committee have lost confidence in the credibility and integrity of Black Diamond and its management based upon a pattern of conduct that certain members of the Bondholders Committee have observed in connection with their service on the pre-petition ad hoc committee of noteholders and the post-petition Bondholders Committee, the pre-petition bid and sale process, and the events that have transpired since the Involuntary Petition date. Based upon their observations and dealings with Black Diamond, a majority of the Bondholders Committee firmly believe, among other things, that: (i) Black Diamond affirmatively misrepresented to the ad hoc bondholders committee Black Diamond's active trading in the Debtors' publicly traded notes (the "Notes") at a time when Black Diamond was receiving highly sensitive and confidential bid information from prospective buyers of the Debtors and was preparing its own bids for HCS; (ii) through such trading, Black Diamond improperly acquired a blocking position in one tranche of the Notes in order to obtain leverage in the bid and plan process; (iii) Black Diamond engaged in trading of the Debtors' Notes in violation of securities laws; and (iv) in addition to its Note trading activity, Black Diamond used the confidential information it obtained as a restricted bondholder to subsume one of the active bidders for HCS and to propose its own lower bid, thus removing what could have been a viable alternative to the Eldorado bid.

Black Diamond has not exhibited the characteristics of a controlling equity sponsor in which a majority in number and amount of the institutions sitting on the Bondholders' Committee have stated they would invest.[11] Taken together with the fact that Black Diamond has no experience in owning a casino operation, and Eldorado possesses all of the characteristics

[11] AIG, TCW and Eaton Vance collectively hold in excess of $116 million in principal amount (approximately 61%) of the Debtors' $189 million in bond debt.

institutions, including members of the Bondholders Committee, look for when they invest with a deal sponsor, a majority in amount and number of the Bondholders Committee is of the firm belief that the deal set forth in the Eldorado Agreement is the superior offer.

## **CONCLUSION**

As Black Diamond has failed to establish cause, termination of the Debtors' exclusive period to file and solicit the Plan is unwarranted. Black Diamond's reliance upon arguments raised in the Examiner Motion, and then refuted in the Mediator Report, now ring hollow. Dissatisfied with the conclusions reached by the Mediator, Black Diamond again seeks to derail the Eldorado Agreement, this time relying upon the January 28 Offer, the latest in a long line of eleventh-hour Black Diamond offers. The Bondholders Committee, in the sound exercise of its fiduciary duties, has considered carefully the benefits and drawbacks of the Eldorado Agreement and the January 28 Offer and, through the vote of a majority in amount and majority in number of its members, has concluded that the best outcome for the estates' bondholders is the structure set forth in the Eldorado Agreement.

In order to minimize the substantial costs associated with the further delay of the exit of the Debtors from bankruptcy, the Bondholders Committee respectfully requests that the Court deny the Motion and permit the Debtors to retain plan exclusivity.

Dated: March 28, 2005

Respectfully submitted:

*/s/ Rudy J. Cerone*
RUDY J. CERONE (Bar No. 14137)
McGlinchey Stafford, PLLC
643 Magazine Street
New Orleans, LA 70130
Telephone: 504-586-1200
Facsimile: 504-596-2760

- and –

ROBERT JAY MOORE
DAVID B. ZOLKIN
Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Boulevard, 30th Floor
Los Angeles, California 90017
(213) 892-4000
(213) 629-5063

Co-counsel for Official Committee of Bondholders

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Opposition of Official Committee of Bondholders to Black Diamond's Motion to Terminate the Debtors' Period of Exclusivity Pursuant to Section 1121(d) of the Bankruptcy Code has been served on the following parties and counsel of record, by depositing same in the United States mail, postage prepaid and properly addressed, this 28th day of March, 2005:

| | |
|---|---|
| Timothy W. Wilhite<br>333 Texas Street, Ste. 1325<br>Shreveport, LA 71101 | Charles H. Kammer, III<br>820 Jordan Street, Suite 480<br>Shreveport, LA 71107 |
| Jeffrey L. Jonas<br>Joseph L. Jonas<br>Brown Rudnick Verlack Israels LLP<br>One Financial Center<br>Boston, MA 02111 | James J. Zenni, Jr.<br>100 Field Drive, Suite 140<br>Lake Forest, IL 60045 |
| Robert W. Raley<br>290 Benton Road Spur<br>Bossier City, LA 71111 | Marguerite K. Kingsmill<br>201 St. Charles Ave., Suite 3300<br>New Orleans, LA 70170 |
| Alan Corkish<br>Deutsche Bank (Cayman) Ltd.<br>Post Office Box 1984GT<br>2nd Floor Elizabethan Square<br>George Town, Grand Cayman | Office of the U.S. Trustee<br>300 Fannin St., Suite 3196<br>Shreveport, LA 71101 |
| David J. Krebs, Esq.<br>Krebs Farley & Pelleteri<br>Greenwich Insurance Company<br>400 Poydras Street, Suite 2500<br>New Orleans, LA 70130 | Kelly A. Loisel<br>2609 Canal Street, Fifth Floor<br>New Orleans, LA 70119 |
| Randall S. Davidson<br>Davidson, Jones & Summers, APLC<br>509 Market Street, Suite 800<br>Shreveport, LA 71101 | Michael B. Fisco<br>Laurie K. Jones<br>90 South Seventh Street, Suite 2200<br>Minneapolis, MN 55402-3901 |

| | |
|---|---|
| R. Joseph Naus<br>Wiener, Weiss & Madison<br>Post Office Box 21990<br>Shreveport, LA 71120-1990 | Hollywood Casino Shreveport,<br>Through its Partners, Shreveport Paddlewheels, L.L.C.<br>Through its agent for service of process<br>Staci A. Rosenberg<br>700 Camp Street<br>New Orleans, LA 70130 |
| Hollywood Casino Shreveport,<br>Through its Partners, HCSI, Inc.<br>Through its agent for service of process<br>CT Corporation<br>8550 United Plaza Blvd.<br>Baton Rouge, LA 70809 | Hollywood Casino Shreveport<br>5601 Bridge Street, Suite 300<br>Fort Worth, TX 76112 |
| State of Louisiana, Dept. of Labor<br>Delinquent Accounts Unit<br>POB 44127<br>Baton Rouge, LA 70804 | Louisiana Department of<br>Revenue and Taxation<br>POB 66658<br>Baton Rouge, LA 70896 |
| Wilhite Electric Company, Inc.<br>4450 Viking Loop Dr.<br>Bossier City, LA 71111 | Shreveport Paddlewheels, LLC<br>610 S. Peters St., Suite 202<br>New Orleans, LA 70130 |
| U.S. Bankruptcy Court<br>300 Fannin Street, Suite 2201<br>Shreveport, LA 71101 | R. Patrick Vance<br>201 St. Charles Avenue<br>New Orleans, LA 70170-5100 |
| James S. Renard, Esq.<br>Joyce M. Hellstern, Esq.<br>Michael L. Smith, Esq.<br>Bicke & Brewer<br>1717 Main Street, Suite 4800<br>Dallas, TX 75204 | |

*/s/ Rudy J. Cerone*
Rudy J. Cerone